CASTLE ENTERPRISES, INC., Appellant, *v.* THE REGISTRAR OF PROPERTY OF SAN JUAN, Respondent.

No. 1387. Decided March 19, 1963.

*Sifre & Ruiz Suria* for appellant. The registrar appeared by brief.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE RIGAU delivered the opinion of the Court.

By public deed the appellant submitted to the horizontal-property regime an office building which it constructed on Ponce de León Avenue at the corner of Parque Street, in San Juan, Puerto Rico, which is known as "Condominio San Martín." Upon presentation of the deed for registration, the respondent registrar partially registered such deed denying registration as to a lot (described in the deed) designated for the parking of motor vehicles.

740

In support of his refusal, the registrar adduced the following two reasons: (1) "because it [the parking lot] is not deemed *a common element* of the Horizontal-Property Regime constituted by this deed, pursuant to § 11 of Act No. 104 of June 25, 1958 (Sess. Laws, p. 243), as amended, and (2) it *does not form a single piece of property* together with the other property described in this document [the lot of the building] *nor are they adjacent to each other, according to the same Act...*" (Italics ours.)

The Condominio San Martín consists of a ground floor which is devoted to commercial purposes and seven upper floors devoted to offices. It is situated, as stated before, at the corner of Ponce de León and Parque Streets. The lot in question, which is the parking area of the Condominio, fronts Parque Street, is near the Condominio at about 100 meters from the building, but it does not adjoin the lot where the building stands.

Are the two contentions of the registrar correct? We believe not. The registrar's first contention to the effect that the parking area is not considered a common element, within the meaning of that term in the horizontal-property regime, is clearly erroneous. The Horizontal Property Act, No. 104 of June 25, 1958 (Sess. Laws, p. 243), designates in § 11 as common elements, among others, the following: the land where the building stands, the foundations, main walls, halls, lobbies, elevators, incinerators, all devices and installations existing for common use, and "all other elements of the building rationally of common use or necessary to its existence, upkeep and safety." 31 L.P.R.A. § 1291i. In the next section that Act provides that "Also deemed common elements, but limited in character...those destined to the service of a certain number of apartments to the exclusion of the others..." 31 L.P.R.A. § 1291j.

It is not necessary to elaborate much to show that a parking area is a very convenient and necessary possession for

the owners of a seven-story office cooperative building situated on Ponce de León Avenue of San Juan, Puerto Rico. We take judicial notice of the dense population of the area, of the dense traffic of motor vehicles along Ponce de León and Parque Streets, and of the acute shortage of parking facilities in the section where Condominio San Martín is situated.[1] Moreover, it may be added that there is an official determination on the necessity of a parking area for that building, the Planning Board having made such a requirement to the builders. The registrar states in his brief that "it is obvious that this exclusive property unit can not exist isolatedly as if it were suspended in the air; it needs to be complemented by other parts or elements of the building which will permit the owner of such unit to enjoy it properly, such as: . . . basements, roofs, patios, and gardens . . ." If it is *obvious* that the property needs basements, roofs, patios, and gardens, it should not be difficult to understand that it also needs a parking area for vehicles, or at least that such parking area be sufficiently useful and convenient to constitute an element "of the building rationally of common use," which is all that the Act requires.

 Therefore, a parking area is truly, according to the Act, an element "of the building rationally of common use," that is, of common use of the joint owners or co-owners, which is what the Act intends. Such element also seems to be in this case "necessary to its existence" (of the building)—again we follow the language of the Act—because, as we have said, it was a condition required of the builders by the Planning Board. We clarify, however, that according to subd. (g) of § 11 of the Horizontal Property Act it is sufficient if it be a common element "of the building rationally of common use," *or* "necessary to its existence, upkeep and safety." It is sufficient that there exist one of

---

[1] *Castro* v. *Transportation Authority,* 72 P.R.R. 435, 438 (1951); *De Castro* v. *Board of Commissioners,* 59 P.R.R. 673, 682 (1942).

those two circumstances in order that the possession be a common element; it is not necessary that both concur. In the case at bar, as indicated, both circumstances concur.

The deed whereby the Condominio San Martín and its dependencies were submitted to the horizontal-property regime provides that the parking area therein described shall be a common element to the seven upper floors, which excludes the first. ("The parcel of land described below is a common element to the seven upper floors to be used for the parking of motor vehicles.") These seven floors are those devoted to offices.

[3] We therefore conclude that such parking area is a common element restricted to Condominio San Martín, according to the express provisions of the Horizontal Property Act contained in §§ 11(g) and 12 thereof, 31 L.P.R.A. §§ 1291i (g) and 1291j. In view of the two provisions *supra* of the Act, it is clear that the enumeration contained therein is not express but rather illustrative. BATLLE, *"La Reforma del Artículo 396 del Código Civil,"* 171 *Revista de Legis. y Jurisp.* 243, 249 (Madrid, 1942), and RACCIATTI, *Propiedad por Pisos o por Departamentos* 73 (Buenos Aires, 1958), share this view. The latter goes even further and at p. 97 of the work *supra* he says:

"In addition to the parts of the building divided into floors or suites for common benefit or necessary for maintaining its safety—some of which, as we have seen, are enumerated in the act by way of illustration—which necessarily must be common, the owners may create (since there is nothing to prevent it), other common elements the purpose of which, although not strictly within these pursuits, shall aim to procure a more convenient use and enjoyment or larger rent . . .

"This is possible . . . because . . . the words *common use* employed in the Act should be taken in their broadest sense. They do not refer simply to the use of the thing, in a strict grammatical or literal sense, but comprise within their amplitude all sorts of elements or services which may benefit the community of owners."

Mr. Justice Tomás Ogayar is also of the same opinion —that the enumeration of common elements contained in the Horizontal Property Act "is clearly by way of illustration." See his *"Nuevo Régimen Jurídico de la Propiedad Horizontal"* in 44 *Revista de Derecho Privado* 859, 871 (Madrid, 1960). Also, RABELLA, *La Propiedad Horizontal* 51 (Barcelona 1960).

■■ The other contention adduced by the registrar for refusing to record the parking lot is that that parcel does not form a single piece of property together with the lot of the building, nor adjoins the latter. We have two objections to make to this second contention. The first is that in a free society, governed by the rule of law, when a public official says to a citizen "You can not do that," that official must be prepared to show that his faculty to impose prohitions on the conduct of any person stems from some specific legal provision, namely, his power must issue from the Constitution, from a statute, or from some regulation promulgated under authority of law. The registrar has not pointed out to us any provision of law or regulation requiring the condition which he is demanding of the appellant, or which empowers him (the registrar) to make such a demand. Nor have we been able to find any. The registrar himself says in his brief, "It is true that that requirement is not expressly provided in the Horizontal Property Act . . ." Yet, he believes that the requirement is implied in the Act. We can not uphold him. Persons may establish covenants, clauses, and conditions which they may deem advisable in their businesses and works, provided they are not in contravention of law (a term which includes here the regulations made under authority of law), morals or public order. 31 L.P.R.A. § 3372. What appellant proposes to do is not in contravention of law, morals, or public order.[2]

---

[2] What we have said in this paragraph is not intended against the respondent registrar who, we are sure, was prompted by the best intention and in the manner which in his judgment it was his duty to act

■ Our other objection to the registrar's second contention is that in construing and administering the Horizontal Property Act a new legislation is construed and administered, the purpose of which is to render possible the realization of social and economic benefits necessary in our times. That is why its interpretation and administration must be constructive and imaginative. Today it is an office building in condominium; tomorrow it may be a residence building in condominium. It is well to recall what CASTÁN, with his customary wisdom, has written on the matter:

"In all solutions proposed by the author the desire to adapt the institution in question to the needs and practical purposes which it is called upon to accomplish in our times is self-evident. Such orientation, in our opinion, only deserves praise. *No matter how important the private-law technique might be, the purpose pursued, which is the backbone of the law, must not be sacrificed to its conveniences of simplicity.* And since the ownership of horizontal property has developed and become generalized in real life, in order to solve such urgent social problems as that of housing, and in order to meet such a vital and human need and desire as having one's house, it is proper that we create the institution and interpret the rules by which it is governed as they best will serve those economic and social needs which constitute their reason of existence." (Italics ours.) Prologue by the author cited to *La Propiedad de Casas por Pisos* 9 (1st ed., Madrid 1933), by Batlle.

We are dealing with a new legislation, we say, but we are conscious of the past. There is a background for this institution of co-operative houses—Egypt, Greece, Rome—and it was also known in Europe in the sixteenth, seventeenth, and eighteenth centuries, although with exceptional character. Its generalization is modern and responds to new economic needs. When modern codification tendencies started in the latter part of the eighteenth century ;and during the nineteenth century, the Code Napoleon, father

---

in interpreting the laws concerned. Such attitude only deserves respect, but we deem it convenient to clarify the situation.

of civil codes, was the first to include this institution in its text. Section 664 of that Code, which dates back to 1804, was adopted with or without changes by many civil codes. Thus, it was adopted by Quebec, Portugal, Italy, Spain, Ecuador, Panama, Honduras, Mexico, China, Japan, Venezuela, Greece, Philippine Is., Cuba and Puerto Rico. In our Civil Code, 1930 ed., it corresponds to § 330, 31 L.P.R.A. § 1275, which is taken from the Spanish § 396. Section 330 of our Civil Code, as it stood before it was amended by Act No. 421 of May 13, 1951 (Sess. Laws, p. 1126), is copied below.[3]

From a reading of our § 330 *supra*—very similar to that of other civil codes, because, as has been said, of their common origin—it is clear that the same is insufficient to govern at this time the different manifestations which modern technique has made possible of this institution of co-operative houses or horizontal property.

After World War I a strong legislative movement was commenced on the matter, and many European and American countries passed special horizontal-property laws in order to satisfy the needs which the scarce and insufficient civil-code provisions could not satisfy.[4] For more details

---

[3] "Section 330.—When the different stories of a house belong to different owners, if the titles of ownership do not specify the conditions under which they must contribute to the necessary expenses thereof, and there exists no stipulation with respect thereto, the following rules shall be observed:

"1. The main and party walls, the roof, and the other things for use in common, shall be preserved at the expense of all the owners in proportion to the value of their stories.

"2. Each owner shall pay the cost of maintaining the floor of his story. The floor of the entry, front door, common yard, and hygienic works common to all, shall be paid for *pro rata* by all the owners.

"3. The stairs from the entry to the first story shall be paid for *pro rata* by all the owners, with the exception of the owner of the ground floor; the stairs from the first to the second story shall be paid for by all, excepting the owners of the ground floor and first story, and in this way successively."

[4] Special horizontal-property laws have been enacted in *Belgium* and *Hungary* in 1924, *Rumania* in 1927, *Brazil* in 1928, *Sweeden* in 1931 and 1942, *Italy* in 1934, 1935, and 1942, *Poland* 1934, *Bulgaria* in 1935, *Chile*

on the historical background of this institution and for considerations of comparative law thereon, see BATLLE, *La Propiedad de Casas por Pisos* 15-41 (3d ed. 1956); GÓMEZ GIL, *La Propiedad Horizontal en Cuba* 27-38 (1954); RACCIATTI, *Propiedad por Pisos o por Departamentos* 3-20 (2d ed. 1958); BUGEDA, *La Propiedad Horizontal* 3-20 (1954); VENTURA-TRAVESET, *Derecho de Propiedad Horizontal* 11-18 (1961); BATLLE, 171 *Revista General de Legislación y Jurisprudencia* 243 (1942); POIRIER, *La Propiedad Horizontal* 1-25 (2d ed. 1955); OGAYAR, 44 *Revista de Derecho Privado* 859 (1960), and II CASTÁN, *Derecho Civil Español, Común y Foral* 329-43 (9th ed. 1957).

The Report to the House of Representatives of Puerto Rico of the Juridical Committee of that body, submitted in connection with the bill which later became our Horizontal Property Act, reads in part:

"As a result of the foregoing, there has arisen the horizontal-property institution, namely, that in which the different floors or apartments of a building belong separately to different owners and the common elements of the building belong to all of them, in co-ownership. This new form of property which, although known in Roman law, was not sufficiently regulated because of its seldom appearance, needs juridical channels through which it may develop in order that it may not be an abode of conflicts which would defeat the realization of the ideal of having one's own home.

"The Latin codes mention the institution and its regulation is scanty and deficient. Subsequently there has been an abundant flourishing of laws on the matter, brought about by the increasing importance and diffusion of this modality, which is being adopted practically throughout the whole world.

---

in 1937, *France* in 1938, *Uruguay* and *Peru* in 1946, *Argentina* and *Colombia* in 1948, *Bolivia* in 1949, *Germany* in 1951, *Holland* in 1951 and 1952, *Cuba* in 1952, *Mexico* in 1954, *Portugal* in 1955, in *Spain* (where the Civil Code and the Mortgage Law were amended in 1939) a special law was enacted in 1960, and in *Puerto Rico*, where the Civil Code and the Mortgage Law were amended in 1951 (following the Spanish amendment of 1939), the existing Horizontal Property Act was enacted on June 25, 1958, Act No. 104, 31 L.P.R.A. § § 1291 to 1293k.

"In Puerto Rico, § 330 of the Civil Code, 1930 ed. (31 L.P.R.A. § 1275), as amended by Act No. 421 of May 13, 1951, regulates the ownership of apartment houses. This provision is supplemented by an amendment incorporated in § 8 of the Mortgage Law (30 L.P.R.A. § 33) by Act No. 422 of May 13, 1951, authorizing the registration of the stories as different properties in the Registry of Property.

*"The provisions of the Civil Code and of the Mortgage Law already mentioned are lacking or insufficient* as respects several vital aspects of horizontal property, as for example, (a) origin and extinguishment of the horizontal property, (b) administrative regime, (c) *organization in the Registry of Property,* (d) liens, and (e) balance of rights and duties among the owners, and, in general, they do not cover with necessary details this institution which, because of its importance, calls for a better regulation.

"For these reasons your Committee recommends the approval of this horizontal-property bill following, in general lines, the provisions of Act-Decree No. 407 of September 16, 1952 of the Republic of Cuba, which is known as one of the most advanced statutes and which sweepingly covers everything bearing on this institution. Naturally, we have introduced those modifications which we have deemed advisable after a study of the matter, as well as those changes necessary to adapt the same to our jurisdiction. The bill contemplates the division of buildings into horizontal property not only for dwellings but also for any other types of use or enjoyment." X Journal of Proceedings (House) 1574 (1958). (Italics ours.)

On this matter, BATLLE writes:

"This is a new figure to which the general proper attention has not been given until recent times, because we also said that the economic necessity to which it responds is recent. Its kind is property law, but it is in itself an outstanding species of the other traditional types, and there is no use in insisting to find similar or partly identical institutions in order to subsume and absorb it under other classical types. Its enormous importance and social transcendence justify more than enough that it be considered independently." [5]

---

[5] *Op. cit.* at 63 (3d ed.). See, also, RACCIATTI, *op. cit.* 30 (2d ed.).

The Declaration of Policy of the Spanish Horizontal Property Act of July 21, 1960, says: "It is therefore the purpose of this Act to follow the social reality of the facts . . . This being so, it is not only necessary that the horizontal-property regime be recognized but also that it be encouraged and channelled, endowing it with a complete and efficient regulation. . . . The Act represents, *rather than a reform of the existing legality, the regulation ex novo, complete, of the apartment co-ownership.*" (Italics ours.)

Returning to the problem of whether or not the registration of the lot in question should be made notwithstanding the fact that it does not adjoin the principal lot, it should be noted that the lawmaker of almost 100 years ago, in drafting the Spanish Mortgage Law and its Regulations, which we have inherited, the product of a highly agricultural civilization, believed that several rural properties could be recorded under a single number even though they are not contiguous to each other, which form "dependent or joined property, with one or more buildings and one or more tracts of land . . . provided they belong to the same parcel and to one person only, or to a number of persons *pro indiviso* . . ." Article 61 of the Mortgage Law Regulations, 30 L.P.R.A. § 919. *Baetjer* v. *Registrar*, 48 P.R.R. 627, 647 (1935).

■ As explained by CASSO ROMERO, it is a *discontinuous* property, which is "formed by several normal properties . . . not contiguous to each other, *but which are joined by reason of economic dependency or connection, for their exploitation or utilization."* [6] (Italics ours.)

As explained by ROCA SASTRE, "in the case of *discontinuous* properties, it shall be necessary [to consolidate them] that there be among the several consolidated properties *an economic connection or dependency . . . which circumstance substitutes the requirement of boundary."* [7] (Italics ours.)

---

[6] *Derecho Hipotecario o del Registro de la Propiedad* 241 (4th ed., Madrid, 1951).

[7] II *Derecho Hipotecario* 114 (5th ed. 1954).

■ There being no express prohibition in the laws of Puerto Rico, and since we are dealing with the construction of a special modern statute which it has been necessary to promulgate in practically all civil-law countries, precisely for the purpose of curing the omissions and insufficiencies of the old civil codes and mortgage laws, it may well be seen that the same argument—that the rural properties which are consolidated by reason of economic dependency or connection for their utilization, are recordable under a single number even though they are not contiguous to each other— which was good a century ago (and is still good), is just as good in the case at bar in which two urban properties which do not adjoin each other "are joined by reason of economic dependency and connection for their enjoyment."

In approaching this problem in a modern fashion, ROCA SASTRE explains that "From the mortgage point of view, two groups of properties are distinguishable: some *normal, common*, or *usual*, and others *abnormal, special*, or *exceptional*." The *normal* property is the tract of land having fixed limits which we all know, and the "*special* properties are those having a special configuration or those things, objects, or sum of elements which, though lacking the aforesaid circumstances, are accorded the mortgage consideration or treatment of normal properties for the purposes of making the corresponding entry in the registry." [8] (Italics ours.)

According to the resolution of January 2, 1928, cited by Roca Sastre in the aforesaid place, "the word property is employed in the Mortgage Law and its Regulations some times with reference to the area bounded and enclosed within a single perimeter, and at other times as a complex mortgage entity which comprises several parcels or diversity of economic elements." The afore-cited author mentions the *discontinuous* properties as an example of those special properties. [9]

---

[8] II *op. cit.* at 63.
[9] *Ibid.*

In recording the parking lot as a common element restricted to Condominio San Martín, the publicity objective, which is the main purpose of the Registry of Property and which is aimed at affording juridical security in the real-property traffic, is not impaired.[10]

■ The fact that the parcel, as a common element restricted to the Condominio, has already its own entry in the registry, is no bar to the registration of such parking lot, inasmuch as the Act provides that the horizontal property is organized in the registry "by a system of property records interconnected by marginal notes in cross reference." 31 L.P.R.A. § 1292c. As pointed out by BATLLE, "The simple solutions are not the best, and the economic and social realities can not be subordinated to the requirements of an abstract technique." [11]

At the beginning of his chapter on *"El Régimen de la Propiedad Horizontal Ante el Registro de la Propiedad,"* *op. cit.* at 98, VENTURA-TRAVESET states as follows:

"Yet, we can verify by long and meditated experience that if the law is not a scientific elucubration which shows the reality but is precisely all the contrary, and proof of this is the first words of the preamble of the new law which categorically affirms that 'if every juridical regime can not be conceived or established behind the back of the exigencies of the social reality at which it is aimed, it must be the more so whenever it deals with an institution which, like horizontal property, has acquired, particularly in the past years, such powerful vitality . . .' if law is a living thing, the mortgage law is also a reality, and that all, absolutely all registry norms are perfectly compatible with that social reality and, therefore, that the organ may be conformed to the function and not the function to the organ."

■■ The registrar points out that the provisions of the Mortgage Law are deemed supplemental to those of the Horizontal Property Act. That is correct. But it should be noted that they shall not be deemed *restrictive* but *sup-*

---

[10] I ROCA SASTRE, *op. cit.* at 18.
[11] *Op. cit.* at 167 (3d ed.).

*plemental.* The Horizontal Property Act being a special act, expressly promulgated for the aforesaid purposes, and due to the insufficiency of the Civil Code and of the Mortgage Law already pointed out, it can not be deemed that the Mortgage Law places the Horizontal Property Act in a strait jacket. It is quite the contrary; in everything that is possible the Mortgage Law shall facilitate the operation in practice of the Horizontal Property Act and the purposes of the latter. As stated in *Arroyo* v. *Registrar*, 86 P.R.R. 343 (1962), "resort is had to the registry for protection, not harm."

It is not amiss to recall that, as stated by Castán, the truth is that the analysis of the motives and purposes of the juridical rule presupposes a delicate and complex analysis of practical interests, of ethical and cultural ideals. It requires, particularly, to delve into the realities of life, into its economic and social needs. And in this fundamental idea are agreed the representatives of the most conflicting schools.[12]

For the reasons stated in this opinion, the registrar's note will be reversed and the registration denied is hereby ordered.

---

[12] *Teoría de la Aplicación e Investigación del Derecho* 241 (1947).